# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DONALD LEE MCDONALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 5417 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| GHALIAH OBAISI, as Independent Executor | ) | |
| of the Estate of SALEH OBAISI, M.D., | ) | |
| Deceased, and WEXFORD HEALTH | ) | |
| SOURCES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Donald Lee McDonald, an inmate at Stateville Correctional Center ("Stateville"), has suffered from lower back pain while incarcerated. In this lawsuit, he challenges the care he received for his back problems between 2013 and 2018, arguing that Dr. Saleh Obaisi and Wexford Health Sources, Inc. ("Wexford") did not provide him with adequate care.[1] The Court has entered judgment for Defendants on several of McDonald's claims, leaving only his claim against Dr. Obaisi for denial of medical treatment and deliberate indifference in violation of the Eighth Amendment under 42 U.S.C. § 1983 (Count I) and his claim against both Defendants for medical malpractice through negligence or willful and wanton conduct under Illinois law (Count VI). *See* Doc. 168. After engaging in expert discovery, Defendants have filed a renewed motion for summary judgment. Because questions of fact exist as to whether Dr. Obaisi acted with deliberate indifference toward McDonald's lower back pain and whether Dr. Obaisi and Wexford committed medical malpractice, the Court denies Defendants' renewed motion for summary judgment.

---

[1] Because Dr. Obaisi is deceased, McDonald brings his claims against Defendant Ghaliah Obaisi as the independent executor of Dr. Obaisi's estate.

# BACKGROUND[2]

## I.      Provision of Medical Care at Stateville

Wexford provides medical services to Illinois Department of Corrections ("IDOC")

inmates, including those at Stateville, McDonald's place of confinement.  Dr. Obaisi served as

Stateville's medical director from August 2012 until his death in December 2017.  In this role,

Dr. Obaisi had responsibility for examining, diagnosing, and treating those inmates referred to

his care, which included making referrals and arrangements with outside medical specialists to

the extent that inmates' health problems exceeded the scope of services Wexford provided at

Stateville.

Inmates at Stateville who need medical attention for non-emergency conditions fill out a

sick call request form and deposit it in the sick call request box at the Stateville Health Care Unit

("HCU").  After 2016, inmates also could sign up for appointments on a sheet posted near the

sick call box.  A nurse then typically meets with the inmate the following day.  If necessary, the

nurse refers the inmate to a doctor or physician's assistant for further consultation and treatment.

If an inmate requires non-emergency care beyond that available at the HCU, Wexford

requires the prison's medical director to obtain approval for the outside referral through a

collegial review process by presenting the inmate's case to a Wexford utilization management

physician.  The utilization management physician either approves the off-site referral or develops

an alternative treatment plan.  Dr. Obaisi participated in collegial reviews on a weekly basis

while serving as Stateville's medical director.  IDOC contracted with the University of Illinois at

---

[2] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts and
McDonald's response brief.  The Court takes all facts in the light most favorable to McDonald, the non-
movant.  Although Defendants complain that McDonald did not comply with the requirements of LR 56.1
because he cites to the record in his response brief, Defendants ignore the fact that this Court's summary
judgment procedures differ from LR 56.1 and allow the non-moving party to cite directly to the record.
Therefore, the Court does not find it appropriate to strike any portions of McDonald's response brief.

Chicago ("UIC") for some of its off-site referrals. Dr. Obaisi testified that UIC scheduled the off-site appointments and triaged them based on their urgency.

## II.     Treatment of McDonald's Lower Back Pain

McDonald, an inmate incarcerated at Stateville since July 21, 1995, has suffered from severe lower back pain and sciatica for years and has consistently requested medical attention to address these conditions. He did not file any grievances related to lower back pain between August 2012 and February 2015, but he did file grievances related to the medical treatment he received for his lower back pain on March 11, 2015 and December 8, 2015.

As relevant to this case, treatment of McDonald's lower back pain began in September 2012, when McDonald met with Jose Becerra for an initial physical therapy evaluation. Becerra conducted a physical examination, finding that McDonald had normal range of motion and very good strength. Nonetheless, based on muscular tightness, Becerra assessed that McDonald may have a herniated disc at the L5-S1 level. Becerra recommended six physical therapy visits to establish a home exercise plan and considered McDonald to have good rehabilitation potential. McDonald attended the six physical therapy sessions with Becerra between September 20 and November 1. During the October 11 session, McDonald complained that his pain had worsened, and, on October 25, McDonald reported his back had become stiff because of a prison lockdown. During his last visit, McDonald indicated he remained sore but his pain had lessened. Becerra assessed that McDonald had made good progress and discharged him with instructions to continue his home exercise plan.

On January 25, 2013, Dr. Obaisi completed and signed an IDOC medical special services referral and report for an MRI of McDonald's lumbar spine. In explaining the rationale for the referral, Dr. Obaisi noted "back pain (court settlement)." Doc. 200 ¶ 19. He also marked the

request as urgent. But, in later testimony, Dr. Obaisi stated that he did not believe that McDonald needed urgent medical attention in January 2013 because his symptoms were under control.

The day after completing the urgent MRI referral form, Dr. Obaisi evaluated McDonald in connection with his complaints of back pain that radiated to his right leg almost daily and numbness. Dr. Obaisi determined that McDonald suffered from chronic lower back pain and numbness of the upper extremity. He ordered laboratory testing for rheumatoid arthritis and prescribed Mobic (Meloxicam), a non-steroidal anti-inflammatory drug ("NSAID") that treats musculoskeletal pain and swelling. Dr. Obaisi also provided McDonald with a one-year medical permit for a low bunk assignment, a double mattress, and daily showers.

Three months after completing the urgent MRI referral form, on April 22, Dr. Obaisi presented McDonald's case for collegial review with Dr. Haymes, a Wexford utilization physician. Instead of authorizing the requested MRI of the lumbar spine, Dr. Obaisi and Dr. Haymes discussed an alternative treatment plan and agreed to have Joe Ebbitt, Wexford's director of risk management, create a treatment protocol and issue a report, at which point Dr. Obaisi and Dr. Haymes would reconsider McDonald's case at a collegial review. Dr. Obaisi testified that they made the decision to pursue an alternative treatment plan because of negotiations between Wexford and McDonald concerning settlement of another lawsuit McDonald had pending at that time. Dr. Obaisi also testified that he did not believe that an MRI was medically necessary at that time and that non-surgical treatment remained the best option. It took until October 1 for Dr. Obaisi to sign off on the decision to pursue an alternative treatment, with Dr. Obaisi testifying that the delay likely occurred because the form had been misplaced.

The record does not reflect that Wexford ever formulated an alternative treatment plan as discussed at the April 22 collegial review.

McDonald saw Dr. Obaisi again for his lower back pain on October 22. Dr. Obaisi ordered an x-ray of the lumbar and dorsal spine and prescribed McDonald 500 mg of Tylenol. McDonald had the x-ray on October 25, which produced negative findings. Dr. Obaisi signed off on these findings on October 29.

On January 13, 2014, McDonald saw a nurse with complaints of ongoing back pain. The nurse gave McDonald Ibuprofen and referred him to Dr. Obaisi for further evaluation. McDonald saw Dr. Obaisi on February 3 and again complained of lower back pain, which Dr. Obaisi assessed as a chronic sprain of the sacroiliac joint. Dr. Obaisi gave McDonald a Depo-Medrol steroid injection intended to decrease inflammation and pain. Dr. Obaisi also renewed McDonald's medical permits.

On April 9, McDonald complained to Claude Owikoti, a physician's assistant, of lower back pain. Owikoti renewed McDonald's Mobic prescription and also prescribed Robaxin, a muscle relaxer. On October 2, LaTanya Williams, another physician's assistant, saw McDonald, who complained of longstanding intermittent right flank pain in the mornings and with certain movements but indicated that the pain did not radiate. Williams diagnosed him with chronic lower back/right flank pain.

On January 29, 2015, McDonald saw Dr. Obaisi with continued complaints of lower back pain. McDonald reported that the steroid injection he had received in February 2014 had helped but that its effects wore off after two months. Dr. Obaisi assessed McDonald to suffer from lower back pain and radiculopathy to the left leg and prescribed him Tylenol for nine months. Dr. Obaisi also gave McDonald another Depo-Medrol steroid injection and renewed McDonald's

medical permits. That same day, Dr. Obaisi completed another medical special services referral and report for an MRI of McDonald's lower back, noting in the rationale for referral "ortho vs. MRI." Doc. 200 ¶ 36. Dr. Obaisi then presented McDonald's case for collegial review on February 24, at which time Dr. Obaisi and Dr. Stephen Ritz, a Wexford utilization management physician, approved the MRI.

While awaiting his MRI appointment, McDonald saw Dr. Obaisi on April 23. Dr. Obaisi provided him with pain medicine and another six-month permit for daily showers, low bunk, low gallery, and a double mattress. The MRI took place on July 28 at UIC. The radiologist found "degenerative changes and increased epidural fat, causing severe central stenosis at L4-L5 and L5-S1." Doc. 200 ¶ 39. Dr. Obaisi received the completed referral and report form back from UIC and signed it on July 29. He then saw McDonald for a post-MRI appointment on August 5, although he had not yet received the MRI results. The appointment was continued to September 1, but again, Dr. Obaisi had not received the MRI results by that time. At the September 1 appointment, McDonald asked for Mobic, a request that prompted Dr. Obaisi to discontinue McDonald's Ibuprofen prescription and replace it with a ninety-day Mobic prescription.

A week later, on September 8, McDonald saw Williams and complained that he could not stand up straight because of his lower back pain. Williams provided McDonald with an abdominal binder and permit, administered a Solu-Medrol steroid injection, and prescribed Robaxin for fourteen days. McDonald testified that the abdominal binder helped as it restricted him from making certain movements. McDonald also signed a records release that day to allow Stateville's medical records department to obtain the report from his July 28 MRI.[3]

---

[3] Dr. Obaisi testified that, at some point after McDonald had his MRI, Stateville began sending inmates to UIC for initial appointments with the authorization form.

Although he had not yet received the MRI results, Dr. Obaisi presented McDonald's case for collegial review with Dr. Ritz on September 8, at which time they approved a referral for an orthopedic consultation at UIC for McDonald's chronic lower back pain. While awaiting that consultation, McDonald saw Williams on October 2 and reported that the steroid injection and abdominal binder he received in September had helped his pain. Williams also prescribed Tylenol for McDonald to take between his Mobic doses. On October 12, McDonald saw Dr. Obaisi, who had finally reviewed the July 28 MRI results. Dr. Obaisi noted that the MRI showed severe spinal stenosis and gave McDonald a Depo-Medrol injection to the paraspinal muscles of his lower back that day. McDonald followed up with Dr. Obaisi on October 28, reporting this time that his condition had not improved after the October 12 steroid injection. Dr. Obaisi prescribed Tylenol #3 with Codeine for sixty days and referred McDonald to physical therapy.

McDonald then saw Dr. Alma Martija on November 3 and requested crutches to help him walk while he awaited his orthopedic consultation. Dr. Martija gave him a two-week medical permit for crutches and also prescribed him Prednisone, an oral steroid. When McDonald saw Dr. Martija a week later, he reported some relief from the Prednisone, prompting Dr. Martija to renew the prescription for an additional sixty days. Dr. Martija next saw McDonald on November 17 and renewed his medical permits. Williams and Dr. Obaisi also completed renewals of McDonald's medical permits in November and December. On January 22, 2016, McDonald again saw Dr. Martija, who renewed his Tylenol #3 with Codeine prescription.

On February 5, 2016, after the IDOC medical director reached out to Dr. Obaisi about McDonald's treatment, Dr. Obaisi learned from UIC that its first available orthopedic evaluation was not until June 2016. This information prompted Dr. Obaisi to request that McDonald see a local orthopedic specialist instead, a request that Dr. Ritz approved. McDonald then saw Dr.

Robert Strugala of Midland Orthopedic on February 8.  McDonald reported to Dr. Strugala that he had experienced lower back pain for over five years and that the pain had increased over the past year.  McDonald also noted he experienced intermittent numbness in his left leg.  Dr. Strugala recommended a neurosurgical consultation, opining that McDonald would need surgery "sooner rather than later" given the severity of the changes in his condition.  Doc. 200 ¶ 56.  Dr. Strugala also discussed alternatives to surgery, including physical therapy and epidural steroid injections.  Upon his return to Stateville from his appointment with Dr. Strugala, McDonald saw Dr. Obaisi, who indicated he would request approval for a neurosurgery consultation.  Dr. Obaisi also renewed McDonald's Tylenol #3 with Codeine prescription for an additional ninety days.  Dr. Obaisi and Dr. Ritz approved McDonald for a neurosurgery consultation on February 16.

While awaiting the neurosurgery consultation, on April 28, McDonald had another physical therapy evaluation with Becerra, which Dr. Obaisi had ordered in October 2015.  Becerra recommended a four- to six-week course of physical therapy with two sessions each week.  But McDonald did not attend his physical therapy sessions on May 5, 12, and 13, leading Becerra to discontinue the program.  McDonald testified that he failed to attend these sessions because he had not received a pass and assumed Becerra had cancelled them.  On May 17, Dr. Obaisi renewed McDonald's medical permits for low bunk, low gallery, crutches, daily showers, slow walk, abdominal binder, and double mattress for one year.  On June 21, McDonald saw Williams and asked for a renewal of his Tylenol #3 with Codeine prescription.  Williams discussed this request with Dr. Obaisi, who approved it for an additional six weeks.

On July 28, McDonald had an initial neurosurgery consultation with Dr. Herbert Engelhard III at UIC.  McDonald reported that his sciatic nerve pain in his lower back was not bothering him at that time and instead complained of bilateral hand numbness.  Dr. Engelhard

8

reviewed McDonald's July 28, 2015 MRI, noted some mild disc protrusions at L4-L5 and L5-S1, diagnosed McDonald with lumbar degenerative disc disease and likely cervical stenosis, and ordered a cervical MRI. Dr. Engelhard did not recommend a lumbar discectomy at the time because McDonald's "radiculopathy ha[d] improved dramatically." Doc. 200 ¶ 64. On August 2, Dr. Obaisi and Dr. Ritz approved the cervical spine MRI and a follow-up neurosurgery evaluation at UIC.

On August 23, McDonald saw Williams again. McDonald requested renewal of his Tylenol #3 with Codeine prescription and complained that he was not receiving his other medications. Williams referred McDonald to Dr. Obaisi and followed up with the pharmacy on McDonald's other medications, including Mobic, which McDonald began receiving again after the appointment. McDonald saw Dr. Obaisi on August 28, claiming that he continued to have lower back pain and was not responding to Tylenol #3 with Codeine or Mobic. Dr. Obaisi nonetheless renewed the Tylenol #3 with Codeine prescription for sixty days, further renewing that prescription for ninety days after meeting with McDonald on October 26 and for an additional ninety days based on McDonald's continued complaints of lower back pain during an evaluation on January 25, 2017.

On February 17, 2017, McDonald had the cervical MRI. On February 22, McDonald had a follow-up neurosurgery evaluation with Dr. Chwajol at UIC, complaining mainly of pain in his right hand. As for lower back pain, Dr. Chwajol noted that McDonald "is getting by with medications and exercise, and lower back pain is not his main concern at this point." Doc. 200 ¶ 71. McDonald then saw Dr. Obaisi on February 27, who noted that the cervical MRI did not reveal any significant findings. Because McDonald reported that the Mobic no longer helped his

pain, Dr. Obaisi prescribed him Voltaren. Dr. Obaisi also renewed McDonald's medical permits at this visit and on April 6.

On April 28, McDonald requested a refill of Tylenol #3 with Codeine from Williams. Williams consulted with a staff physician, Dr. Aguinaldo, and ultimately provided McDonald with a prescription for Tylenol #3 with Codeine until he could see Dr. Obaisi. McDonald saw Dr. Obaisi on May 17, who renewed the Tylenol #3 with Codeine prescription for ninety days based on McDonald's continued complaints of pain. Dr. Obaisi also presented McDonald's case for collegial review with Dr. Ritz on May 23, and they approved a referral to a UIC pain specialist.

On June 30, a Wexford physician renewed McDonald's Voltaren prescription for ninety days. On August 14, after consulting with Dr. Obaisi, Williams renewed McDonald's Tylenol #3 with Codeine prescription for ninety days. McDonald saw Dr. Obaisi on August 23, who again renewed his medical permits. Dr. Obaisi also prescribed him Prednisone and referred him to Becerra for another physical therapy evaluation. That physical therapy evaluation occurred on November 2, with Becerra recommending an eight- to twelve-week program that focused on a home exercise plan. McDonald attended nine physical therapy sessions with Becerra. Becerra then discharged McDonald from the program on January 3, 2018, noting the unlikely benefit of continued physical therapy and "suspect[ed] poor compliance with [the] home exercise program." Doc. 200 ¶ 88.

Meanwhile, on October 23, 2017, McDonald had his first appointment with the UIC pain clinic. McDonald reported severe pain, which did not abate when changing body positions, did not respond to prior treatment, and affected his daily activities. A physical examination revealed that McDonald's sensation and strength were intact and that he had full range of motion in the

lumbar spine.  The pain clinic recommended that McDonald continue his current medication regimen and also gave McDonald an epidural steroid injection at the L4-L5 level.  Upon his return to Stateville, on October 25, McDonald saw Dr. Obaisi, who ordered him a new abdominal binder and prescribed him Mobic for ninety days.  On October 31, Dr. Obaisi presented McDonald's case for collegial review with Dr. Hector Garcia.  They approved a follow-up visit to the UIC pain clinic.  On November 13, McDonald presented to Williams with a request to renew his Tylenol #3 with Codeine prescription.  Williams referred McDonald to Dr. Obaisi, who saw him the next day and renewed the Tylenol #3 with Codeine prescription for ninety days.  On November 16, McDonald returned to the UIC pain clinic.  Dr. Dylan Afeld gave McDonald another epidural steroid injection, this time at the L5-S1 level.  McDonald saw Dr. Obaisi that same day, who directed McDonald to follow up as needed.  Dr. Obaisi died on December 23, 2017.

The parties do not discuss developments with respect to McDonald's lower back pain over the following year, picking up instead on November 29, 2018, when McDonald had another lumbar spine MRI.  That MRI showed worsening degenerative disc disease at the L4-L5 and L5-S1 levels, a herniated disc at L4-L5, severe bilateral neural foraminal narrowing at L5-S1, and central disc herniation at L5-S1.  On December 5, Dr. Chwajol saw McDonald and reviewed the November 29 MRI, concluding that it showed "quite severe degenerative disk disease with mild to moderate stenosis at both levels."  Doc. 200 ¶ 90.  Dr. Chwajol noted that conservative therapy with physical therapy and injections had failed and that McDonald now qualified as an "ideal candidate for lumbar fusion."  Doc. 200 ¶ 90.  Dr. Chwajol ordered a CT scan and flexion-extension x-rays of the lumbar spine, discussed surgical options with McDonald, and planned for surgery in three to four months.  McDonald ultimately had the lumbar surgery in May 2019.

### III. Expert Testimony

Dr. Obaisi testified that he typically exhausts conservative treatment prior to presenting an inmate's case to collegial review. For lower back pain, Dr. Obaisi opined that conservative treatments include NSAIDs, back braces, steroid injections, physical therapy, at home exercises, and medical permits for such things as low bunk, low gallery, and a double mattress. He further testified that he did not consider treatment costs when determining whether to make an outside referral. Although Wexford has written guidelines for treatment, Dr. Obaisi testified that he did not use them but instead relied on his own judgment based on his experience. He believed that McDonald received the most clinically appropriate treatment for his lower back pain.

Dr. Joseph Rabi, a board-certified doctor in physical medicine and rehabilitation who treats patients in interventional pain management, disagreed, opining that he did not know of a legitimate medical reason for McDonald's course of treatment. Dr. Rabi acknowledged that he is not a spinal surgeon but noted that he often refers patients to spinal surgeons. He opined that McDonald presented with lumbar radiculopathy, in other words, nerve compression from a herniated disc and arthritis, and/or lumbar spinal stenosis, or enclosure around the spinal cord canal. According to Dr. Rabi, the typical treatment for these diagnoses would be an initial four- to six-week conservative course of physical therapy, anti-inflammatories, and/or muscle relaxers. If these did not work, the next step would be an MRI and then possibly referral to an interventional pain physician for epidural steroid injections or referral to a spine surgeon. He testified that intramuscular steroid injections may not work for patients with lower back pain and are not typically given to patients with spinal stenosis. Dr. Rabi opined that epidural steroid injections should instead be used for mild to moderate disc herniation and could provide radiculopathy symptom relief for between two weeks and six months. According to Dr. Rabi,

12

non-operative treatments such as NSAIDs, physical therapy, and steroid injections will not fix the underlying structural defects causing spinal stenosis or degenerative disc disorder, with a decompression and fusion ultimately required.

In Dr. Rabi's opinion, McDonald's medical treatment did not meet the standard of care because Dr. Obaisi and Wexford undertreated his pain by unreasonably delaying the MRI and its review. Although Dr. Rabi agreed that nothing in Becerra's physical therapy notes in November 2012 suggested McDonald had an urgent medical condition, he nonetheless opined that McDonald urgently needed an MRI in January 2013. He further averred that McDonald experienced unreasonable delays in having the MRI approved, performed, and reviewed between January 2013 and October 2015, and that Dr. Obaisi and Wexford unjustifiably delayed an orthopedic spine or neurosurgical consultation after learning of the MRI results in October 2015. Dr. Rabi testified that the structural condition of McDonald's spine had likely worsened between 2013 and 2016 but nonetheless acknowledged that even had McDonald seen a neurosurgeon before 2016, the neurosurgeon likely would have recommended pain management and steroid injections before surgery. Dr. Rabi maintained that had McDonald seen a neurosurgeon in 2013, he likely would have received epidural injections and ultimately surgery on a faster timetable. Dr. Rabi further opined that McDonald's treatment with oral steroids and intramuscular steroid injections was destined to fail because he only received the steroid injections infrequently. Dr. Rabi opined that intramuscular steroid injections given every three months would likely have provided McDonald with short-term relief for approximately one to two months, while epidural injections could have provided up to six months of pain relief.

Dr. Wellington Hsu, who is board certified in orthopedic surgery and specializes in orthopedic spine surgery, opined that Dr. Obaisi and the Wexford staff treated McDonald's

lumbar stenosis and spondylosis reasonably, compassionately, and within the community standard of care. Dr. Hsu does not believe that McDonald needed an MRI in 2013 because he demonstrated only minimal symptoms and retained a good range of motion and strength at that time. Once McDonald's symptoms progressed in 2015, Dr. Hsu believes an MRI was medically indicated but not on an urgent basis. Dr. Hsu opined that a patient with non-severe consistent pain could go two or three years without an MRI, with an MRI required only for surgery. But Dr. Hsu testified that if he marked an MRI urgent, he would expect the patient to receive the MRI between one hour and one week later, while a non-urgent MRI would occur between one week and one year later. He acknowledged that none of his patients have had to wait two years to obtain an MRI or other treatment after he submitted an urgent medical order. Dr. Hsu stated that a patient with severe central stenosis, leg pain, and back pain would normally see a specialist within a year of presentation of those symptoms. He also opined that a patient with severe central stenosis but only lower back pain could go one year without following up with a specialist, as those symptoms typically do not lead to treatment aside from therapy.

Dr. Hsu opined that the conservative yet progressive approach Dr. Obaisi took before the 2015 MRI complied with the standard of care because Dr. Obaisi continuously treated McDonald with all of the standard treatments for lumbar stenosis and spondylosis: NSAIDs, muscle relaxers, pain relievers, steroid injections, medical permits, and abdominal binders. Dr. Hsu found it reasonable that Dr. Obaisi tried to treat McDonald's lower back condition for two years before referring McDonald to a specialist for surgical evaluation. Dr. Hsu does not believe that McDonald's treatment would have changed if Dr. Obaisi had referred him for spinal surgery evaluation in 2013. Dr. Hsu also opined that McDonald's treatment after 2015, including physical therapy, medication, and steroid injections, was appropriate and alleviated McDonald's

symptoms.  And, unlike Dr. Rabi, Dr. Hsu did not believe that epidural steroid injections would have been recommended earlier given their riskiness.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record.  Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).  The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018).  In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial.  Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014).  The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013).  However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I.    Deliberate Indifference (Count I)

McDonald's deliberate indifference claim carries both an objective and subjective component.  To satisfy the objective component, McDonald must demonstrate that his medical condition is "objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the subjective component, McDonald must demonstrate that Dr. Obaisi acted with a "sufficiently culpable state of mind." *Id.*  McDonald need not show that Dr. Obaisi desired or intended the harm that transpired.  *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). Rather, it is enough to show that Dr. Obaisi knew of, and disregarded, a substantial risk of harm to McDonald.  *Id.*

The parties do not, and cannot, contest that McDonald suffered from an objectively serious medical condition.  Indeed, McDonald's degenerative spinal stenosis, which has significantly affected his daily activities and caused chronic and substantial pain, is serious as a matter of law.  *See Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (noting that the existence of an injury "that significantly affects an individual's daily activities" or that causes "chronic and substantial pain" indicates that a prisoner has a serious medical need).

However, Defendants do contest the subjective component, that Dr. Obaisi knew of McDonald's condition and failed to provide adequate care.  The question for the Court is whether, when viewing the record in the light most favorable to McDonald, a reasonable trier of fact could conclude that Dr. Obaisi subjectively knew of McDonald's serious medical condition and either knowingly or recklessly disregarded it.  *Id.* at 524.  Negligence does not meet this standard.  *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).  Even admitted medical malpractice does not suffice, nor does a mere difference of opinion as to the proper course of

treatment. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). Rather, "[t]o infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396.

The Court must "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Evidence that can support a finding of deliberate indifference includes a doctor "persist[ing] in a course of treatment known to be ineffective," a doctor "choos[ing] an 'easier and less efficacious treatment' without exercising professional judgment," or "an inexplicable delay in treatment which serves no penological interest." *Id.* at 729–30. Here, McDonald contends that Dr. Obaisi exhibited deliberate indifference because he delayed in ordering and reviewing an MRI of his back and obtaining an appointment for him with a specialist, in addition to continuing a course of ineffective palliative treatment. Although a close question, the Court agrees with McDonald that he has presented sufficient evidence for this claim to go to a jury.

Initially, "'inexplicable delay' in responding to an inmate's serious medical condition can reflect deliberate indifference . . . . especially . . . if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citations omitted). In this case, Dr. Obaisi completed an MRI referral form, which he marked urgent, on January 25, 2013. He then failed to present the request for collegial review until April 22, 2013, despite participating in collegial review on a weekly basis. While Dr. Obaisi testified that he did not actually believe the need for an MRI was urgent at the time and the referral was instead prompted by Wexford's attempts to settle a separate lawsuit brought by

17

McDonald, Dr. Obaisi also testified that he typically exhausted conservative treatments before presenting a case for collegial review. This could suggest that he had determined in early 2013 that McDonald needed a higher level of treatment for his lower back pain. And while Wexford agreed to create an alternative treatment plan for McDonald in April 2013, the record does not include any evidence of such an alternative treatment plan; instead, it indicates that Dr. Obaisi failed to provide any treatment for McDonald's lower back pain in the months after the collegial review. It was not until two years after Dr. Obaisi initially determined that McDonald's back pain required an MRI that Dr. Obaisi again put in a request for one, but even then, he again waited a month to present the request for approval and it took until July 28, 2015 for McDonald to have the MRI. Even Dr. Hsu, Defendants' expert, testified that if he marked an MRI urgent, he would expect the patient to receive the MRI between one hour and one week later, while a non-urgent MRI would occur between one week and one year later.

"[A] delay in ordering tests must be evaluated in light of the entire record to determine if it evinces deliberate indifference." *Lloyd v. Moats*, 721 F. App'x 490, 494 (7th Cir. 2017). An inmate typically cannot complain about delays in ordering diagnostic testing, as "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107; *Grant v. Heidorn*, 802 F. App'x 200, 205 (7th Cir. 2020) (complaint that plaintiff wanted MRI and orthopedic consult "much sooner than he received them" could not support a claim of deliberate indifference because the decision of whether to conduct an MRI is a matter of medical judgment). But here, a question exists as to whether Dr. Obaisi exercised any medical judgment when failing to follow through on the MRI he had marked as urgent in January 2013 when he let the referral fall by the wayside, did not formulate an alternative treatment plan, and waited another two years before

reviving that request.  *See Goodloe*, 947 F.3d at 1031 ("[W]hen a doctor is aware of the need to undertake a specific task and fails to do so, the case for deliberate indifference is particularly strong.").

A reasonable juror could also find that Dr. Obaisi's delay in reviewing the MRI results further suggests deliberate indifference.  *See Cumbee v. Ghosh*, No. 11-CV-3511, 2016 WL 5404597, at *4 (N.D. Ill. Sept. 28, 2016) ("Among other delays that seem to defy reasonable explanation, Ghosh did not review the November 2006 MRI ***that he had ordered*** for five months, and did not review it with Cumbee for two additional months.").  True, the record reflects that some delay in obtaining the results likely cannot be attributed to Dr. Obaisi and Dr. Obaisi did present McDonald's case for collegial review even before reviewing the results, but these facts only create another disputed issue.  *See id.* at *5 ("If a patient's condition is sufficiently serious to warrant sending them for an expensive imaging test, the least a doctor can do it [sic] read the results and use them to attempt to alleviate the patient's pain in a timely fashion.").  And while Dr. Obaisi did obtain approval for an orthopedic consult in September 2015, he did not take action to ensure that McDonald saw an orthopedic specialist until after the IDOC medical director inquired of McDonald's condition in February 2016.  *See Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021) ("[A] physician's delay, even if brief, in referring an inmate to a specialist in the face of a known need for specialist treatment may also reflect deliberate indifference.").

Finally, a question of fact exists as to whether the delays in obtaining and reviewing the MRI and obtaining an appointment for McDonald with a specialist unnecessarily prolonged McDonald's suffering.  Some evidence in the record suggests that nothing would have changed if the MRI had occurred in 2013, given that the specialists McDonald saw after the MRI

suggested the exhaustion of other treatments before surgery and Dr. Obaisi followed the

specialists' recommendations. *Cf. Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016) ("A jury can

infer conscious disregard of a risk from a defendant's decision to ignore instructions from a

specialist."). Further, the fact that McDonald did not file any grievances concerning lower back

pain between August 2012 and March 2015 could suggest that his pain during that time was

manageable. On the other hand, Dr. Strugala noted in February 2016 that, in light of the "rather

severe changes" in McDonald's lower back condition, he "anticipate[d] surgical intervention

[would] be necessary sooner rather than later." Doc. 200-7 at 51. And Dr. Rabi opined that the

delay harmed McDonald because, without the delay, McDonald likely would have exhausted the

recommended conservative treatments sooner and had surgery on a faster timetable, eliminating

some of the over six-year gap between Dr. Obaisi's first recommendation of an MRI for

McDonald's lower back pain and surgery. The Court thus finds that questions surrounding Dr.

Obaisi's delays must go to the jury. *See Thomas*, 991 F.3d at 771 ("Failure to provide necessary

relief and delaying access to a qualified specialist can lead to prolongation of pain."); *cf.*

*Christopher v. Liu*, --- F. App'x ----, 2021 WL 2577132, at *3 (7th Cir. June 23, 2021) (delay did

not support a finding of deliberate indifference where the plaintiff did "not point to any evidence

that the continuation of his existing course of treatment during the relevant period caused him

further harm"); *Harrison v. Wexford Health Sources, Inc.*, 669 F. App'x 797, 799 (7th Cir. 2016)

(seventeen-month delay in referring the plaintiff to a specialist did not amount to deliberate

indifference where, "[d]uring these 17 months, Dr. Obaisi regularly altered Harrison's

prescriptions for pain-relieving, anti-inflammatory, and muscle-relaxing drugs based on

Harrison's condition" and "ordered and reviewed Harrison's MRI to ensure that he properly

diagnosed his injury").

20

On top of questions related to the delay in obtaining treatment, the Court finds questions of fact exist as to whether Dr. Obaisi pursued a course of treatment he knew was ineffective. Because McDonald cannot "demand specific care" or "the best care possible," *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011), many of his complaints about Dr. Obaisi's treatment decisions amount merely to "[d]isagreement[s] between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment," which do not suffice on their own to establish deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Murphy v. Wexford Health Sources Inc.*, 962 F.3d 911, 916–17 (7th Cir. 2020) (expert testimony that the defendant's steroid treatment deviated from the standard of care merely "highlight[ed] a difference in medical opinion over the course of treatment[,]" which suggested "negligence rather than deliberate indifference"); *Zaya*, 836 F.3d at 807 ("By itself an expert's assessment that a treatment decision was unreasonable is not enough to establish conscious disregard of a known risk."). At the same time, however, a doctor cannot continue to pursue a course of treatment known to be ineffective. *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005); *see also Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("[A] doctor's choice of the 'easier and less efficacious treatment' for an objectively serious medical condition can still amount to deliberate indifference[.]"). Here, for example, despite McDonald having informed Dr. Obaisi in August 2016 that Tylenol #3 with Codeine no longer provided him any relief, Dr. Obaisi continued to treat McDonald's lower back pain with Tylenol #3 with Codeine through mid-2017. A reasonable juror could infer deliberate indifference from Dr. Obaisi's "obdurate refusal to alter [McDonald's] course of treatment despite his repeated reports that the medication was not working and his condition was getting worse." *Greeno*, 414 F.3d at 654; *see also Petties*, 836 F.3d at 731 ("evidence that the patient repeatedly complained of enduring pain with no

21

modifications in care" can create an issue of fact); *cf. Pyles*, 771 F.3d at 412 (no deliberate indifference where the defendant prescribed new medications or changed the dosages in response to the prisoner's complaints that the medications were not helping). Therefore, because questions of fact exist as to whether Dr. Obaisi acted with deliberate indifference toward McDonald's lower back pain, McDonald's claim must proceed to a jury.

## II. Medical Malpractice (Count VI)

To prove his claim for medical malpractice based on negligence or willful and wanton conduct, McDonald must show: (1) the proper standard of care against which Defendants' conduct is to be measured; (2) that Defendants failed to comply with the applicable standard of care; and (3) that Defendants' failure proximately caused McDonald's injuries. *Benison v. Silverman*, 233 Ill. App. 3d 689, 693 (1992); *see also Lorenc v. Forest Pres. Dist. of Will Cnty.*, 2016 IL App (3d) 150424, ¶ 19 ("Under the common law, willful and wonton conduct is not a distinct tort but a form of aggravated negligence.").

"A plaintiff must present expert testimony to establish the applicable standard of care and to show whether the defendant's conduct falls below the standard of care." *Musser v. Gentiva Health Serv.*, 356 F.3d 751, 760 (7th Cir. 2004). Here, the parties have both provided expert testimony as to the proper standard of care.[4] Dr. Rabi has testified that Dr. Obaisi's and Wexford's conduct fell below the appropriate standard of care, while Dr. Hsu and Dr. Obaisi both opined that McDonald received appropriate treatment. While the experts disagree as to whether Dr. Obaisi complied with the standard of care, these disagreements only create questions of fact for the jury. And because the standard for deliberate indifference is higher than that under state law for medical malpractice, *see Duckworth v. Ahmad*, 532 F.3d 675, 681 (7th Cir. 2008)

---

[4] Although Defendants argue that Dr. Rabi's opinions are speculative, they do not mount a challenge to their admissibility. Therefore, the Court at this stage does not engage in a *Daubert* analysis and finds that questions regarding the weight to be accorded to Dr. Rabi's opinions are properly left for the jury.

("[M]edical malpractice . . . falls short of deliberate indifference."), the Court's conclusion that issues of fact preclude summary judgment on the deliberate indifference claim similarly carries over to the medical malpractice claim.  Therefore, the Court denies summary judgment on the medical malpractice claim as well.

## CONCLUSION

For the foregoing reasons the Court denies Defendants' motion for summary judgment [197].


Dated: September 1, 2021

SARA L. ELLIS
United States District Judge